

# NUMBER 13-12-00612-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## IN THE INTEREST OF J.A.S. JR., A CHILD

### On appeal from the 24th District Court
### of Victoria County, Texas.

## MEMORANDUM OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Longoria
Memorandum Opinion by Justice Rodriguez**

Appellant J.M. appeals the trial court's order terminating her parental rights to

J.A.S. Jr. (J.A.S.), a child, born April 5, 2009.[1]  *See* Tex. Fam. Code Ann. § 161.001

---

[1] We will refer to the appellant as J.M. and her child as J.A.S, in accordance with rule of appellate procedure 9.8.  *See* Tex. R. App. P. 9.8(b) (providing that in a parental-rights termination case, "the court must, in its opinion, use an alias to refer to a minor, and if necessary to protect the minor's identity, to the minor's parent or other family member"); Tex. Fam. Code Ann. § 109.002(d) (West Supp. 2011) ("On the motion of the parties or on the court's own motion, the appellate court in its opinion may identify the parties by fictitious names or by their initials only.").

(West Supp. 2011). Following a bench trial, the trial court found that J.M. violated one of the statutory grounds for termination, specifically section 161.001(1)(O). *See id.* § 161.001(1)(O). It also found by clear and convincing evidence that termination was in the child's best interest. *See id.* § 161.001(2); *see also id.* § 153.002 (West 2008). Based on these findings, the trial court terminated J.M.'s parental rights and appointed appellee the Texas Department of Family and Protective Services (the Department) as J.A.S.'s temporary managing conservator. By three issues, J.M. asserts that (1) the trial court erred in denying her motion to dismiss, and (2–3) the evidence is insufficient to support the termination. We reverse and remand.

## I. BACKGROUND

On November 4, 2010, after receiving a report alleging J.M.'s neglectful supervision of J.A.S., the Department filed suit against J.M. At that time, J.M., J.A.S.'s mother, was herself a child under the care and custody of the Department. She and nineteen-month-old J.A.S. had been living in San Antonio, Texas, at Seton Home, a supervised-care facility for teen mothers (fifteen to eighteen years of age) and their children.

The petition filed by the Department sought protection of J.A.S., conservatorship, and termination of J.M.'s parental rights in a suit affecting the parent-child relationship. In support of its petition, the Department filed the affidavit of Christopher McKelvy, who was J.M.'s caseworker with the Department at that time. The affidavit set out the following facts, which McKelvy avowed necessitated J.A.S.'s removal because J.M. provided neglectful supervision: (1) on November 3, 2010, J.M. was arrested for assault

2

and booked into the Bexar County Jail, leaving J.A.S. without a caregiver; (2) on October 31, 2010, J.M. refused to parent J.A.S., stating that she wanted to sleep; and (3) in October 2010, J.M. had left her placement without explanation or plan to return.

An emergency hearing was held on the day the petition was filed. The Department appeared through McKelvy and its attorney.[2] Following the hearing, the trial court entered an emergency temporary order naming the Department as the child's temporary managing conservator and setting an adversary hearing for November 16, 2010. *See id.* § 262.205(b)(2) (West 2008).

J.M. appeared at the November 16 adversary hearing, and on December 7, 2010, the trial court entered an order in which it found that there was "sufficient evidence to satisfy a person of ordinary prudence and caution that . . . allowing the child to remain in the home would be contrary to the child's welfare." *See id.* § 262.201(b)(1) (West Supp. 2011). It ordered that J.M. have limited access to J.A.S. in the form of supervised visitation. The trial court also ordered J.M. to (1) appear in, submit to, and cooperate fully in the court-ordered psychological or psychiatric evaluation; (2) attend and cooperate fully in counseling sessions; (3) attend, participate in, and successfully complete parenting classes; and (4) submit to and cooperate fully in the court-ordered drug and alcohol dependency assessments and testing. In addition, the court ordered J.M. to provide the Department and the trial court with, among other things, her current residence and phone number, and any changes in her residence address or phone number. Finally, the trial court ordered J.M. "to comply with each requirement set out in the

_____

[2] A transcript of the hearing does not appear in the appellate record; however, the trial court noted their appearances in the emergency temporary orders.

Department's original, or any amended, service plan during the pendency of this suit," and it informed J.M. that failure to comply with this service plan might result in the restriction or termination of her parental rights. The court appointed the Department as J.A.S.'s temporary managing conservator. *See id.*

A number of permanency hearings were held over the next year, with orders reflecting on May 6, 2011, that J.M. had demonstrated some compliance with the service plan; on August 26, 2011, that J.M. had not demonstrated some compliance with the service plan; and on March 5, 2012, that J.M. had not demonstrated adequate and appropriate compliance with the service plan. The dismissal date for the case was set and reset to May 7, 2012, the same day on which the trial on the merits began.

Although the trial began on May 7, 2012, the portion of the trial addressing J.M.'s parental rights was continued until September 10, 2012.[3] Before the trial continued on that date, J.M. filed a motion to dismiss, arguing that the suit "should have been dismissed on May 7[,] which is the date not later than the 180th day after the time [pursuant to] 263.401(a) which is the anniversary of the temporary orders." *See* TEX. FAM. CODE ANN. § 263.401(a) (West 2008). Following argument of counsel, the trial court denied J.M.'s motion and proceeded to trial.

The Department called J.M.'s and J.A.S.'s caseworkers and counselors to testify. McKelvy, who had worked with J.M. as a minor in CPS custody in 2009, testified that he did not think J.M. was capable of taking care of a three-year-old child. McKelvy

---

[3] After hearing evidence on May 7, 2012 and then again on July 17, 2012, the trial court found that it was in the best interest of J.A.S. that the parental rights of his biological father be terminated. The court ordered his rights terminated, and J.A.S.'s father has not appealed that determination.

4

explained that he went over the family plan with J.M. again and again, but she did not "car[e] enough to pay attention" and "didn't want to follow through." He also talked with J.M. about "placing her child's needs above her own," and "time and time again [J.M.] did just the opposite." He explained that J.M. "has not demonstrated . . . a willingness to provide the care for the child," and "[s]he has not provided the willingness to care for him so . . . that definitely is the idea that she can't care for him." McKelvy testified that the Department requested termination of parental rights.

Dawn Conrad, the caseworker who took over J.A.S.'s file from McKelvy when J.M. became an adult on June 4, 2011, provided similar testimony. When asked if she felt that J.A.S. would be in danger of being abused or neglected by J.M. if reunited, Conrad responded, "I fear that he'd be neglected, yes. . . . [b]ecause I have nothing to go on but her past and how she's . . . working her services." When asked if J.M. was doing better, Conrad answered, "No. She's still putting her needs in front of [J.A.S.'s needs]." Conrad testified that J.M. does not understand what it takes to be a parent and that the Department is concerned with J.M.'s history and the ties she still has with her family. According to Conrad, the Department thinks it is in the best interest of J.A.S. that J.M.'s rights be terminated.

Diana Sneed, a CASA case supervisor, testified that J.A.S. was in the Department's care when she began supervising J.M.'s case in November 2011. In February 2012, CASA filed a report recommending that J.M.'s rights be terminated because she was not demonstrating the ability to provide a stable environment for J.A.S. This recommendation was based on the fact that J.M. continued to change partners, that

5

she had not been compliant with her service plan, and that she failed to take anything away from parenting classes. In addition, J.M. lacked a relationship with her son. According to Sneed, there was no bond between them; rather, J.A.S. had bonded with his foster family. Sneed was also concerned about the lack of family and financial support. Sneed visited with J.M. at her apartment, but did not meet her husband because he was working. Sneed also perceived a number of inconsistencies in J.M.'s relationships with her family and was concerned that J.M. would have no support system to help her if J.A.S. moved back to Victoria with her. Sneed did not know what work J.M. had done because she had never given CASA proof of employment. Sneed testified that "CASA feels that termination is in order." Sneed believed that it was in J.A.S.'s best interest never to see his mother again. Finally, Sneed testified that, at the time she testified at trial in September 2012, she recommended termination for the same the reasons she gave in February.

The Department also called J.A.S.'s foster mother and a family counselor as witnesses. J.A.S.'s foster mother since December 19, 2011 testified that J.A.S. is very happy, very smart, talkative, outgoing, has a great personality, and likes to play and have fun. According to J.A.S.'s foster mother, after a visit with J.M. on Friday, the weekend and following week are difficult. After a visit where J.M. tells J.A.S. he is going to live with her, J.A.S. is "very, very clingy." He cries for his foster mother. She sits and hugs him, and J.A.S. tells her he needs her and is happy with her. J.A.S. has had a number of outbursts at daycare following his visits with J.M. J.A.S. calls his foster mother and father Mommy and Daddy and his biological mother by her first name. He did not

6

mention J.M.'s husband to his foster mother after J.A.S. visited with him and J.M. on August 17, 2012, shortly after their marriage. According to J.A.S.'s foster mother, only about two to three visits before that J.A.S. had started mentioning J.M.

Gabriella Odell, a family counselor who counseled J.A.S. and his foster parents at their request, testified that J.A.S., at three years of age, was bright, cheerful, smiling, playful, and active, although quiet during the counseling session, talking only when prompted. According to Odell, J.A.S. engaged very well with his foster parents and appeared to be happy in this placement; he had bonded with his foster parents, appeared to have a strong attachment to them, and referred to them as Mommy and Daddy. Odell testified that she would be concerned with how J.A.S.'s behavior would change if that bond were broken. Odell did not have any information about J.A.S.'s attitude or love for his biological mother. She had not heard J.A.S. say anything about his biological mom; he had never mentioned her by name.

Wendy Orsak, a licensed professional counselor working for Reclamation, testified for the defense. Orsak began counseling J.M. in November 2011, as part of the CPS case. The counseling sessions were sporadic at first and were terminated. However, in March or April, counseling resumed and had been regular since that time. According to Orsak, J.M. had improved. She now has the maturity, the desire, and the positive attitude to take what she learns in her parenting classes and in her counseling sessions and apply them elsewhere, specifically toward loving and supporting J.A.S. Although it still takes some time for J.M. to accomplish things, she is figuring them out on her own. For example, J.M. has followed through on obtaining her GED. J.M. is also looking

7

toward going to college. Orsak testified that J.M. is independent now. She is married and living in an apartment, although, as Orsak noted, the apartment is funded by her husband. Orsak understood that J.M.'s husband has a legal permit to work here. Orsak met J.M.'s husband and after talking with him, got the impression that he planned to treat J.A.S. as his own child, not as a stepchild.

Orsak had no concerns about drugs or alcohol with J.M. She had no real issues with J.M. abusing or neglecting J.A.S. Orsak testified that she wants J.M. to succeed and is not concerned that J.M. has missed visits with J.A.S. Orsak does not have concerns about J.M. getting J.A.S. back. Orsak believes that J.M. will be able to care for her son properly. She has "high hopes" for J.M. being successful as a parent with J.A.S. According to Orsak, J.M. is one of two clients she has seen over the course of her counseling career who had amazing resiliency to overcome everything. Although Orsak testified that J.M. is ready to get J.A.S. back, she recommended that J.A.S.'s return be monitored with the Department giving J.M. further support and extra guidance; not all resources should be pulled from beneath J.M. Orsak would like to see one-on-one counseling for at least six months until J.M. is comfortable parenting on her own. In her opinion, it would be in everybody's best interest to ensure that J.M. continues her counseling.

Finally, J.M. testified on her own behalf. On direct examination, J.M. explained that she came to CPS in August 2009 while she was living with her grandmother. She was taken from her parents because they were mentally and physically unstable, and she was being physically abused. At that time, J.A.S. was a few months old. She and

8

J.A.S. first lived at Bluebonnet Ranch, then in the Piaz's foster home, and then at Seton Home. After she left Seton Home, she went back to the Piaz's foster home until her eighteenth birthday on June 4, 2011.

J.M. agreed that she had problems at Seton Home. On the occasion that J.M. was arrested, she fought with a girl, who she claimed had smashed J.A.S.'s finger in the door as J.M. was walking with him. J.M. testified that she was arrested at 10:30 a.m., right after the fight. According to J.M., she was in jail a couple of hours, leaving around 5:00 that evening, not even changing into jail clothing. She testified that she was gone four hours when she was arrested for assault and booked in the jail leaving J.A.S. without a caregiver. J.M. did not agree that she was in jail three days, as McKelvy had testified. J.M. did not feel that it was necessary to take J.A.S. out of her custody because of this incident.

J.M. testified that after she was released from jail she went to Seton Home "to get her stuff." Her grandmother had told her that CPS had taken J.A.S. during that time because nobody was able to get him. According to J.M., it was the policy at Seton Home for the staff members not to interact with the "kids," and if he was not in daycare, there was no one to watch him. J.M. testified that the assault case was dismissed; she has no criminal history.

J.M. also explained that other than one positive drug test at Seton Home, she has had no other problem with drug usage. J.M. also testified that the Department did not give her a referral to an anger management program; that she attempted to complete everything on the plan, including parenting classes and her high school education; that

9

she is enrolled in college classes and wants to join the police force; and that she completed most of the tasks, except for being able to visit J.A.S. regularly. Regarding her visits with J.A.S., she explained she did not have trouble making her earlier visits because friends, a friend's mom, and Piaz would help her. According to J.M., in November 2011, she moved to Victoria to be closer to J.A.S.; however, he was moved to San Antonio. After that, the visits were not consistent, although her aunt would take her. She testified that, now, her husband would help her see J.A.S. in San Antonio. J.M. testified that she could not visit because of work and because she could not ask for days off. J.M. explained that she did not make her difficulty in getting to San Antonio known to the CPS because she felt nothing would be done—CPS had never helped her. She testified that she had failed a recent driving test. However, if she had a car and a driver's license, J.M. explained that she would have been at every single visit.

During a break after her direct examination had been completed, J.M. left the courtroom and did not return. The Department and J.A.S.'s attorney ad litem did not have the opportunity to cross-examine her. After hearing closing arguments, the trial court found that it was in the best interest of J.A.S. that the parental rights of J.M. be terminated and ordered J.M.'s parental rights terminated as to the minor child J.A.S., based on the "totality of the evidence and the actions of the parties in this hearing."

On September 21, 2012, the trial court entered its written order finding "by clear and convincing evidence that termination of the parent-child relationship between [J.M.] and the child the subject of this suit is in the child's best interest." The court also found

> by clear and convincing evidence that [J.M.] failed to comply with the provisions of a court order that specifically established the actions for the

10

mother to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

This appeal followed.

## II. MOTION TO DISMISS

By her first issue, J.M. contends that the trial court erred in denying her motion to dismiss, which she claims was timely filed. In response, the Department asserts that the trial court did not err in its ruling because the motion was not timely filed. We agree with the Department.

Section 263.401(a) of the family code provides the following:

Unless the court has commenced the trial on the merits or granted an extension under Subsection (b), on the first Monday after the first anniversary of the date the court rendered a temporary order appointing the department as temporary managing conservator, the court shall dismiss the suit affecting the parent-child relationship filed by the department that requests termination of the parent-child relationship or requests that the department be named conservator of the child.

*Id.* The current version of section 263.402, which was in effect when this proceeding began on November 4, 2010, further provides that,

A party to a suit under this chapter who fails to make a timely motion to dismiss the suit under this subchapter waives the right to object to the court's failure to dismiss the suit. A motion to dismiss under this subsection is timely if the motion is made before the trial on the merits commences.

*Id.* § 263.402(b) (West 2008).

In the present case, it is undisputed that the trial began on May 7, 2012. J.M. filed her motion to dismiss on September 10, 2012, more than four months after the trial

11

commenced. Because the motion was not timely filed pursuant to section 263.402(b), J.M. waived her right to object to the trial court's failure to dismiss the suit. *See id.* Thus, the trial court did not err in denying the motion. We overrule J.M.'s first issue.

### III. EVIDENTIARY ISSUES

By her remaining issues, J.M. challenges the sufficiency of the evidence to support the termination of her parental rights. She claims, by her second issue, that the evidence is legally and factually insufficient to support the trial court's finding that her parental rights should be terminated under section 161.001(1)(O) of the family code. *See id.* § 161.001(1)(O). In her third issue, J.M. asserts that the evidence is insufficient to support the finding that termination is in the best interest of J.A.S. *See id.* § 153.002. Because our review of the best-interest finding is dispositive of the appeal, we address J.M.'s third issue first. *See* TEX. R. APP. P. 47.1.

### A. Standard of Review

"Due process commands that courts apply the clear and convincing evidentiary standard in parental rights termination cases." *In re E.N.C.*, 384 S.W.3d 796, 809 (Tex. 2012) (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982)); *see In re B.G.*, 317 S.W.3d 250, 257 (Tex. 2010) (observing that a parental rights termination case implicates "fundamental liberties" and "a parent's interest in maintaining custody of and raising his or her child is paramount" (quoting *In re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003))). Any complaint that the evidence is legally or factually insufficient to support the findings necessary for involuntary termination is analyzed by this heightened standard of appellate review. *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17,

12

25 (Tex. 2002). The clear and convincing standard is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007 (West 2008); *J.F.C.*, 96 S.W.3d at 265–66.

A legal-sufficiency challenge to a termination decree requires us to review all of the evidence to determine whether the evidence viewed in the light most favorable to the finding is such that the factfinder reasonably could have formed a firm belief or conviction about the truth of the matters as to which the Department bore the burden of proof. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005); *J.F.C.*, 96 S.W.3d at 266. We "must consider all of the evidence, not just that which favors the verdict." *J.P.B.*, 180 S.W.3d at 573; *J.F.C.*, 96 S.W.3d at 266. We "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *J.P.B.*, 180 S.W.3d at 573 (quoting *J.F.C.*, 96 S.W.3d at 266); *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005); *see also Jordan v. Dossey*, 325 S.W.3d 700, 712–13 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). "If [an appellate court] determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *J.F.C.*, 96 S.W.3d at 266. In our factual sufficiency review, "[i]f, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a fact[ ]finder could not have reasonably formed a firm belief or conviction in the truth of its finding, then the evidence is

13

factually insufficient." *In re M.C.T.*, 250 S.W.3d 161, 168 (Tex. App.—Fort Worth 2008, no pet.) (citing *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam)).

## B.    Applicable Law

In order to justify the termination of parental rights pursuant to section 161.001, the Department must establish, by clear and convincing evidence, (1) that the parent committed one or more of the enumerated acts or omissions justifying termination and (2) that termination is in the best interest of the child.   TEX. FAM. CODE ANN. § 161.001; *C.H.*, 89 S.W.3d at 23.   In addition, although the best interest of the child is often infused with the statutory grounds for termination under section 161.001(1), the best interest determination must have a firm basis in facts standing apart from the offending behavior under the statute.   *In re S.R.L.*, 243 S.W.3d 232, 235 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *see In re A.A.A.*, 265 S.W.3d 507, 516 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (op. on reh'g) (explaining that evidence proving one or more of the statutory grounds for termination may be probative in determining that termination is in the best interest of the child).

There is a strong presumption that keeping a child with a parent is in the child's best interest.   *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam).   In reviewing a best-interest determination, we may consider:   (1) the child's wishes; (2-3) the child's emotional and physical needs now and in the future, emotional or physical danger posed to the child now and in the future; (4) the parenting skills of those seeking custody; (5) programs available to assist those seeking custody to promote the child's best interest; (6) plans for the child's future; (7) the stability of the home; (8) any conduct by the parent

14

that might show that the existing parent-child relationship is improper or harmful; and (9) any excuse for that conduct. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

Prompt and permanent placement of the child in a safe environment is also presumed to be in the child's best interest. TEX. FAM. CODE ANN. § 263.307(a) (West 2008). In determining whether J.M. was willing to provide J.A.S. with a safe environment, the trial court could have considered, among other factors, the following: (1) the results of psychiatric, psychological, or developmental evaluations of family members who have access to the child's home; (2) whether there is a history of abusive or assaultive conduct by the child's family who have access to the child's home; and (3) whether an adequate social support system consisting of an extended family and friends is available to the child. *See id.* § 263.307(b) (6-7) & (13).

**C. Discussion**

By her third issue, J.M. contends that the evidence was legally and factually insufficient to support the trial court's finding that termination of her parental rights was in J.A.S.'s best interest. J.M. argues that,

> [o]ther than a multitude of witnesses that testified as to J.M.'s failure to visit her child under the circumstances imposed by [the Department] and who testified that J.M. had made mistakes while a teenager in foster care after being taken from her own abusive parents, [the Department] presented minimal and scant evidence relevant to each *Holley* factor that would support a finding by clear and convincing evidence that termination of J.M.'s parental rights was in the best interest of J.A.S.

**1. The *Holley* Factors**

**a. The Desires of the Child**

We agree with J.M. that there is no direct evidence in the record regarding the

desires of J.A.S., who was three at the time of trial. J.A.S.'s foster mother testified that J.A.S. is very happy; however, after some visits with J.M., he clings to her and tells her he needs his foster mother and is happy with her. She also testified that J.A.S. did not mention J.M.'s husband after J.A.S. had visited with him on August 17, 2012, shortly after the marriage. According to J.A.S.'s foster mother, he had only started mentioning J.M. about two to three visits before that. In addition, family counselor Odell testified that J.A.S. had bonded with his foster parents, and CASA supervisor Sneed stated that J.M. lacked a relationship with her son and that J.A.S. had bonded with his foster family.

While there is evidence that J.A.S. is happy in his foster home and has bonded with his foster parents, we are concerned that his lack of a relationship with J.M. was, in part, the result of the Department's actions in placing J.A.S. with a foster family in San Antonio. The dynamics of J.A.S.'s present living arrangement is no evidence that J.A.S. would not want to live with his mother. This lack of evidence does not constitute clear and convincing evidence regarding the child's wishes. *See E.N.C.*, 384 S.W.3d at 808. Therefore, we cannot conclude that this first *Holley* factor weighs in favor of termination.

### b. Present and Future Emotional and Physical Needs and Present and Future Emotional or Physical Danger Posed by J.M.

The Department's primary concern involves J.M.'s visits with J.A.S. and her parenting skills. These actions or omissions on the part of J.M. could impact J.A.S.'s emotional and physical well-being and could indicate that J.M. might pose emotional and physical danger to J.A.S., both in the present and in the future.

The evidence established that J.M. participated in approximately one-third to one-half of her scheduled visits with J.A.S. The Department's caseworkers and a CASA

16

case supervisor testified that J.M. failed to demonstrate her understanding of the services through her supervised interactions with her child and that J.M. also failed to demonstrate her ability and willingness to parent J.A.S. appropriately, i.e., to put his needs before her own and to demonstrate an ability to change the pattern of behavior that resulted in neglect. They recommended termination of J.M.'s parental rights.

However, J.M.'s current counselor Orsak, who had been counseling J.M. since November 2011 and had counseled with her more than twenty times before trial, explained that while J.M.'s actions were sporadic at first, she has improved. J.M.'s counseling sessions have become regular, and although it still takes time for J.M. to accomplish things, she is getting serious and figuring things out on her own. Orsak is not concerned that J.M. has missed visits with J.A.S. According to Orsak, J.M. is taking on responsibility and has followed through with many things, including obtaining her GED, getting married, and living in her own apartment. J.M. is also planning to attend college.

J.M. also testified that she had complied with many parts of the service plan. In addition to continuing her education and improving her participation in the counseling program, J.M. explained that other than one positive drug test at Seton Home, she has had no other problem with drug usage, thus, maintaining a drug-free lifestyle. J.M. also testified that the Department did not refer her to an anger management program. Instead, anger management was addressed in her counseling classes.

We cannot conclude that the trial court could have reasonably disbelieved or found Orsak's testimony and J.M.'s testimony to be incredible, such that the trial court would not consider it. *See J.P.B.*, 180 S.W.3d at 573 (quoting *J.F.C.*, 96 S.W.3d at 266); *City of*

17

*Keller*, 168 S.W.3d at 827; *see also Jordan*, 325 S.W.3d at 712–13. While a trial court could measure a parent's future conduct by her past conduct regardless of recent improvement, *see Jordan*, 325 S.W.3d at 732 ("Although evidence shows Jordan has made some recent improvements to her past situation, those improvements cannot absolve her of her long history of irresponsible choices."), on the basis of the record before us, we cannot conclude that a reasonable fact-finder could have formed a firm belief or conviction that J.M.'s current progress should not be considered. Furthermore, the Department did not explain or provide any evidence illuminating how J.A.S.'s physical and emotional needs would go unmet if she continues to participate in the program as she is doing at the present time. It did not explain or provide any evidence clarifying how J.M.'s present actions or omissions, if any, would pose a danger to J.A.S.'s physical and emotional needs. Without disregarding this testimony, the evidence on the record before us does not constitute clear and convincing evidence. *See E.N.C.*, 384 S.W.3d at 802. Therefore, we cannot conclude that the second and third *Holley* factors weigh in favor of termination.

### c. Parental Abilities of Those Seeking Custody

In this case, although J.M.'s caseworkers spoke of her negative behaviors, we cannot conclude that this fourth factor weighs in favor of termination, observing that the evidence suggests J.M. has matured, has improved her parenting skills through regular counseling sessions, has availed herself of services provided by the Department, has set goals, and has become motivated to accomplish those goals.

### d. Programs Available to Assist Those Seeking Custody to Promote the Child's Best Interest

18

The evidence shows that the Department provided, and could continue to provide, programs to assist J.M. While J.A.S. remains in the care and custody of the Department, the programs would be available to J.M. In fact, J.M.'s participation would be required by court order and through the Department's service plan. Orsak has recommended that those programs be continued presently and during J.A.S.'s transition from his foster home to his home with J.M. Therefore, the programs would be available to J.M. The evidence shows that J.M. has begun to take initiative and is motivated to avail herself of these programs. And there is no evidence the programs offered by the Department would not be available to assist J.M. Thus, this fifth *Holley* factor weighs against termination.

### e. Plans for the Child's Future

In this case, J.M. plans to have J.A.S. live at her apartment. J.M. does not have a driver's license, but has attempted to get one. She can rely on her husband and an aunt for transportation until she gets her driver's license. J.M. testified that she has a high school diploma. She is also enrolled in college classes. J.M. hopes to become a police officer. In addition, although J.A.S. has bonded with his foster family, he has begun to mention his mother. We also note that although the Department did not provide testimony regarding J.A.S.'s placement, its plan for the child was apparently to leave him with the same foster parents. Nonetheless, lack of such plans does not preclude a factfinder from finding that the termination of parental rights is in a child's best interest. *See C.H.*, 89 S.W.3d at 28. This sixth *Holley* factor, then, is either neutral or weighs against termination of J.M.'s parental rights**.**

19

### f. Stability of J.M.'s Home

J.M. testified that, while under the care and custody of the Department, she and J.A.S. first lived at Bluebonnet Ranch, then in the Piaz's foster home, and then at Seton Home. After she left Seton Home, J.M. went back to the Piaz's foster home until her eighteenth birthday on June 4, 2011. The evidence reveals that since that time, J.M. had one relationship in San Antonio and, upon her return to Victoria, met and, after nine months, married her husband. Although the Department expressed difficulty in contacting J.M. because she failed to inform the Department of any changes in her address or phone number, the information was available through her counselor and her attorney.

At the time of the termination hearing, J.M. was married and lived in an apartment with her husband. Although the Department complains that J.M. withheld this information, Orsak testified that she had the opportunity to meet and talk with J.M.'s husband. Her impression was that he planned to treat J.A.S. as his own child, not as a stepchild. According to Orsak, she understood that J.M.'s husband, who has a legal permit to work here, is supporting J.M., who is, or has been, working at local restaurants. While the court could consider J.M.'s past instability, we cannot disregard her current stability, which the Department does not directly challenge. Therefore, there is a lack of evidence establishing the instability of J.M.'s home in Victoria. We cannot conclude that the seventh *Holley* factor weighs in favor of termination.

### g. Any Conduct on the Part of J.M. that Might Show the Existing Parent-Child Relationship Is Improper

The trial court could have concluded that the following acts or omissions indicated

that the existing parent-child relationship between J.M. and J.A.S. was not a proper one: (1) J.M. placed her needs ahead of her child's needs; (2) J.M. lacked motivation to complete her services in a timely fashion; and (3) J.M. was not consistent in her visits with her son and had not developed a bond with him. However, according to Orsak's testimony, it is clear that J.M.'s actions and understanding are improving. Her participation in activities of the Department has increased, and according to her present counselor, J.M. is showing initiative and is motivated to accomplish effective parenting skills. In light of her current progress, the Department has not shown how J.M.'s earlier conduct shows that the existing parent-child relationship is improper. Again, we cannot conclude that this eighth factor weighs in favor of termination.

### h. Any Excuse for the Parent's Improper Conduct

Orsak testified that J.M.'s history could explain some of J.M.'s negative behaviors and noted that J.M. had not had "a lot of good role models for her to follow." J.M. testified that she refused to go to chemical dependency classes after her positive drug test in February 2010 because the class was "overboard"—it showed people shooting up and how drugs were made, and she just did not feel comfortable. When asked about her visits with J.A.S., J.M. explained she had help getting to her earlier visits. However, when she moved back to Victoria, the Department placed J.M. with a foster family in San Antonio and changed her visits with J.A.S. from Victoria to San Antonio. J.M. testified that she had no car and no driver's license, and it was more difficult to get to the visitations in San Antonio because of her transportation problems and her work schedule. J.M. explained that she had failed a recent driving test, but if she had a car and a driver's

21

license, she would have been at every single visit. The Department directs us to no evidence disputing J.M.'s excuses. We conclude that this ninth factor weighs against the finding that termination was in the child's best interest.

### 2. Texas Family Code Section 263.307 Factors

Section 263.307(b) factors address the safe environment of the child, which is presumed to be in the child's best interest. *See* TEX. FAM. CODE. ANN. § 263.307(b) (6-7). The Department argues that J.M. would not provide a safe environment for J.A.S. because there is a history of abusive or assaultive conduct by the child's family members who have access to the child's home; J.M. would house her brother when he was released from the Department's care; and J.M. had knowledge of the allegations of sexual abuse of her brother by their uncle.

J.M. testified that she came to CPS in August 2009 while she was living with her grandmother. She was taken from her parents because they were mentally and physically unstable and because she was being physically abused. McKelvy testified that he recommended that J.M. disassociate herself from her family, but to his knowledge, she had not done so. Conrad testified that the Department is concerned with J.M.'s history and the ties she still has with her family.

However, J.M. testified about her relationship with her parents, which included physical abuse. And while there was testimony that J.M. had seen her mother and her father, each on one occasion, there was no testimony that J.M.'s parents have access to her home or that they would be involved in the care of J.A.S. J.M. testified that an aunt and her husband would be available to help. We cannot conclude that this is clear and

22

convincing evidence that J.M.'s limited contact with her family, specifically her parents, will impair her ability to provide a safe environment for J.A.S.

J.M. also testified that she had known her husband for nine months before they were married. According to J.M., her husband is supportive of her reuniting with J.A.S. and is willing to help raise him. Orsak testified that she had a conversation with J.M.'s husband. She got the impression that he planned to treat J.A.S. as his own child. Orsak also understood that he had a permit to work here legally.

Orsak further acknowledged that she and J.M. had discussed allegations made by J.M.'s brother that he had been sexually abused by their uncle. According to Orsak, J.M. expressed concern about her brother. J.M. shared some of the following information with Orsak: her brother, who had just turned eighteen, was on medications for mental problems, but was going to refuse to take his medications because he was no longer in the Department's care. Orsak and J.M. discussed that it would not be a good idea for her brother to live with her. According to Orsak, J.M. told the Department that her brother could live with her, but only if he had no other place to go because J.M. did not want him living on the street.

This safe-environment factor weighs against termination because the Department's position is based on speculative future behavior. In addition, J.M. discussed these matters with Orsak, considering them in a well-reasoned manner.

### 3. Application

The Department is required to prove by clear and convincing evidence that termination of a parent's right to her child is in the child's best interest, and the evidence

23

introduced at trial fails, at this juncture, to support the Department's burden as to the best-interest finding. Considering all evidence, including evidence that supports the deemed finding regarding best interest, undisputed evidence, and evidence that the trial court could not have reasonably disbelieved, especially the testimony regarding J.M.'s current progress, *see J.F.C.*, 96 S.W.3d at 268, we conclude that no reasonable factfinder could have formed a firm belief that it was in J.A.S.'s best interest to terminate J.M.'s parental rights.[4]  Thus, the evidence is legally insufficient.  *See id.* at 265–66*; see also* TEX. FAM. CODE ANN. § 101.007.  Because the evidence is legally insufficient to support the finding that termination is in the child's best interest, we conclude that the trial court erred in terminating J.M.'s rights pursuant to section 161.001 of the family code. *See* TEX. FAM. CODE ANN. § 161.001.  We sustain J.M.'s third issue.[5]

---

[4] At the end of the termination hearing and before entering its oral pronouncement of termination, the trial court provided the following reasoning for his termination order:

> An overriding concern of the Department throughout this hearing has been a reluctance on [J.M.'s] part to assume responsibility for her actions or to face the realities of life.  I understand she's very young but if you abandon a child even for fifteen minutes in frustration or anger, it can be deadly to a child that's three-and-a-half years old. . . . [T]he [c]ourt is extremely concerned that the mother would walk out of the hearing before its conclusion and not return and I can only infer from that that she has a willingness to abandon difficult situations.  And raising children, it's a difficult task filled with many difficult situations.

The court then ordered termination based on the "totality of the evidence and the actions of the parties in this hearing."

While we do not condone J.M.'s failure to return, we conclude that it was unreasonable for the trial court to give such weight to her action, in light of the very positive evidence that J.M. has matured and is improving in her ability to parent J.A.S.  It appears that the trial court relied heavily on J.M.'s action and disregarded all testimony about J.M.'s recent improvement in this area.

[5] Having held that the evidence is legally insufficient, we need not conduct a factual sufficiency analysis on the best-interest finding.  *See* TEX. R. APP. P. 47.1.  Moreover, although there is clear and convincing evidence that J.M. violated section 161.001(1)(O) of the family code by failing to comply with the trial court's order and the Department's service plan, we need not address J.M.'s remaining issues because our best-interest determination is dispositive of this appeal.  *See id.*

24

## IV. CONCLUSION

Accordingly, we reverse the trial court's order of termination because termination is not in J.A.S.'s best interest at this time and remand the case to the trial court for further proceedings in accordance with this opinion.

We do not conclude that the child's best interest is unquestioningly for him to be reunited with his mother; it is possible that the child's best interest is to remain in foster care.[6] On remand, the Department will have several options to consider, including offering J.M. a service plan to visit J.A.S. on a schedule that is feasible and appropriate for both mother and child and allowing J.M. an opportunity to comply with the plan.


NELDA V. RODRIGUEZ
Justice

Delivered and filed the 28th
day of February, 2013.

---

[6] We note that J.M. does not challenge the Department's conservatorship of J.A.S.

25